```
                    UNITED STATES DISTRICT COURT
                    EASTERN DISTRICT OF KENTUCKY
                      CENTRAL DIVISION at LEXINGTON
```

DAPHNE JUDE FLYNN,              )
                                )
    Petitioner,                 )   Civil Action No. 5:06-323-JMH
                                )
v.                              )
                                )
MICHAEL BORDERS,                )
                                )   **MEMORANDUM OPINION & ORDER**
    Respondent.                 )
                                )
                                )

              \*\*    \*\*    \*\*    \*\*    \*\*

Before the Court is Daphne Jude Flynn's petition for the return of her daughter, Jenna Rae Borders [Record No. 1]. Jenna's father, Michael Borders, filed an answer to the petition [Record No. 4], and the Court subsequently conducted a hearing on this matter on December 1, 2006. Both parties filed post-hearing briefs; therefore, the Court has been adequately apprised of the issues and this matter is ripe for a decision.

### Jurisdiction

This petition involves the International Child Abduction Remedies Act ("ICARA"), 42 U.S.C. §§ 11601-11610 (2000), which is the enabling legislation of the Hague Convention on the Civil Aspects of International Child Abduction, *opened for signature* Oct. 25, 1980, T.I.A.S. No. 11670, 1343 U.N.T.S. 89 (hereinafter "Hague Convention"). The Hague Convention was adopted by the signatory nations, which include the United States and Ireland, "to secure the prompt return of children wrongfully removed to or retained in

any Contracting State" and "to ensure that rights of custody and of access under the law of one Contracting State are effectively respected in the other Contracting States." Hague Convention, art. 1.

Under ICARA, this Court has concurrent original jurisdiction with state courts over actions arising under the Hague Convention. 42 U.S.C. § 11603(a). A petition for return may be held "only in the place the child is located at the time the petition is filed." *Id.* § 11603(b). Pursuant to the Convention, this Court has jurisdiction to decide the merits of the abduction claim but not the merits of any underlying custody dispute. Hague Convention, art. 19; 42 U.S.C. § 11601(b)(4); *Friedrich v. Friedrich*, 78 F.3d 1060, 1063-64 (6th Cir. 1996) ("*Friedrich II*").

### Factual and Procedural Background

Petitioner Daphne Jude Flynn ("Flynn") and Respondent Michael Borders ("Borders") were married in Georgia on May 2, 1989, and divorced in Georgia on March 23, 1998. They have two children, Jesse, born February 6, 1990 and Jenna, born March 3, 1994. Only Jenna is the subject of this petition.[1] In the final judgment and decree of divorce dated March 23, 1998, the Superior Court of Athens-Clarke County Georgia awarded custody of Jesse and Jenna to

---

[1] Jesse is not named in the petition, presumably because Jesse turned sixteen on February 6, 2006, and the Hague Convention cannot provide any relief to Flynn because of his age. Hague Convention, art. 4.

Borders ("the Georgia Order"). (Ex. A to Borders's Resp.)

In 1997, Flynn had taken a then three-year-old Jenna to Ireland while then seven-year-old Jesse stayed in Georgia with Borders. Borders allowed Jesse to visit Ireland in 1999. According to Borders, Flynn would not allow Jesse to return to the United States. When Borders went to Ireland in July of 2000, he petitioned under the Hague Convention to have both children returned to him in the United States based on the Georgia Order that awarded him sole custody. Out of that proceeding, the High Court of Ireland issued an order on March 30, 2001, in which it referenced a "settlement" between the parties and a consent entered into by Borders and Flynn ("the High Court Order"). (Ex. D. to Petition.) This order (1) struck the Georgia Order, (2) granted Flynn and Borders joint custody over Jesse and Jenna, (3) granted Flynn custody ten months of every twelve months, (4) granted Borders custody from June 15th to August 15th of each year, and (5) required Borders to pay all travel expenses for the children's travel to the United States. In her affidavit, Flynn states that the High Court Order was "agreed on consent" and that both parties were represented by counsel. Borders strongly disagrees with this characterization, claiming that he agreed to an order that would allow him to have primary custody of the children during their secondary school years and that the High Court Order erroneously omitted that specific agreement. In his post-hearing brief,

3

Borders claims that the Irish court made numerous errors in deciding his 2000 petition, including ordering a psychological evaluation and directing Borders and Flynn to participate in mediation.  Although he informed his appointed Irish solicitor of his objections to the order, Borders never appealed the High Court Order.

As Borders was "[g]iven no alternative but to live with the order, he did so" until 2006, when he kept Jenna from returning to Ireland after August 15, 2006.  (Respondent's Post-Hearing Br. 6.) Borders claims that having primary custody of Jenna in 2006 was the part of his agreement with Flynn that was omitted from the High Court Order, and he relies on the 1998 Georgia Order as the "only valid custody order."  (*Id.*)  Arguing that Borders has wrongfully retained Jenna here in the United States, Flynn filed the instant petition under the Hague Convention asking this Court to return Jenna to Ireland.  Borders's dissatisfaction with the High Court Order forms the basis of his defense against Flynn's current petition.

**Analysis**

The purpose of the Convention is to "protect children internationally from the harmful effects of their wrongful removal or retention and to establish procedures to ensure their prompt return to the State of their habitual residence, as well as to secure protection for rights of access." Hague Convention,

preamble.

"Wrongful retention" is a legal term strictly defined in the Hague Convention. The Hague Convention defines retention as wrongful when "it is in breach of rights of custody attributed to a person, an institution or any other body, either jointly or alone, under the law of the State in which the child was habitually resident immediately before the removal or retention" and at the time of the removal, "those rights were actually exercised, either jointly or alone, or would have been so exercised but for the removal or retention." Hague Convention, art. 3.

Flynn, as the petitioner seeking return of Jenna, must demonstrate by a preponderance of the evidence that she had and was exercising custody rights over Jenna under Irish laws and that Ireland is the child's habitual residence. 42 U.S.C. § 11603(e)(1). Flynn has the burden of showing by a preponderance of the evidence that Borders is wrongfully retaining Jenna within the meaning of the Convention. *Id.* § 11603(e)(1)(A). If Flynn meets this burden, the burden shifts to Borders to show that his wrongful retention of Jenna is justified based on one of the following exceptions:

> [a] the person, institution or other body having the care of the person of the child was not actually exercising the custody rights at the time of removal or retention, or had consented to or subsequently acquiesced in the removal or retention; or
> [b] there is a grave risk that his or her return would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation.

5

Hague Convention, art. 13. Thus, Borders must show (1) by a preponderance of the evidence that Flynn consented to Borders keeping Jenna in the United States, 42 U.S.C. § 11603(e)(2)(B), or (2) by clear and convincing evidence that there is a grave risk that returning Jenna to Flynn would expose her to physical or psychological harm or otherwise place her in an intolerable situation, 42 U.S.C. § 11603(e)(2)(A).

**I.   Habitual Residence**

The Convention does not explicitly define "habitual residence." *Mozes v. Mozes*, 239 F.3d 1067, 1071 (9th Cir. 2001). Habitual residence is not the same as the concept of domicile and neither one's nationality nor one's intent to return play a role in determining one's habitual residence. *See Friedrich v. Friedrich*, 983 F.2d 1396, 1401 (6th Cir. 1993) ("*Friedrich I*"). Habitual residence must be determined based on the facts of each individual case and courts rely on several factors such as whether there is a degree of settled purpose in the country. *See Feder v. Evans-Feder*, 63 F.3d 217, 226 (3d Cir. 1995).

The Ninth Circuit in *Mozes* and the Sixth Circuit in *Friedrich I* have turned to British cases for guidance on the construction of "habitual residence." *See Mozes*, 239 F.3d at 1073-74; *Friedrich I*, 983 F.2d at 1401. The Sixth Circuit has stated that in determining habitual residence, a court must "focus on the child, not the parents, and examine past experience, not future

6

intentions," *Friedrich I*, 983 F.2d at 1401. *But see Mozes*, 239 F.3d at 1080 ("The facts of *Friedrich* thus provided no legitimate occasion for a broad pronouncement that parental intent is irrelevant to the question of habitual residence."). The court observed that a person can have only one habitual residence, that habitual residence pertains to residence prior to removal, and that the court "must look back in time, not forward." *Friedrich I*, 983 F.2d at 1401.

Flynn has submitted a Declaration of Habitual Residence to the Court in which she states that Jenna was living with her in Dublin from June 6, 1997, until June 24, 2006, when she went to Kentucky to visit Borders. Jenna was born in the United States, but except for visits to the United States to see Borders during the summer, she has lived with her mother in Ireland since 1997. The High Court Order limits Jenna's summer visits to the United States to a duration of two months or less. After her summer visits, she always returned to Ireland to spend the rest of the year with Flynn and attend school.

Borders does not dispute this time line and offers no relevant evidence in response to support his contention that Jenna was a habitual resident of the United States at the time she was retained by Borders in August of 2006.[2] Borders continues to rely on an

---

[2] Borders directs the Court's attention to the Georgia Order, claiming that Jenna was a habitual resident of the United States when Flynn wrongfully removed her in 1997 and that the United

agreement that is not included in the High Court Order that Jenna would leave Ireland and spend her secondary school years in the United States. But Borders concedes that he and Flynn mutually agreed to the part of the High Court Order that states that Jenna would spend most of each year and attend school in Ireland. Essentially, Flynn and Borders agreed back in 2001 that Jenna's habitual residence was Ireland. Borders's present intentions for Jenna, standing alone, do not serve to change her habitual residence at the time she was retained by Borders on August 15, 2006. *See Mozes*, 239 F.3d at 1077.

Based on the evidence presented by the parties, it appears that Jenna visited Borders once a year for the temporary purpose of spending the summer with him in the United States and then returned to Ireland. This is the pattern she has followed since 2002, when the High Court Order states that she was to begin spending two months of each year with Borders. The Court finds that Jenna was a habitual resident of Ireland, the country where she has lived with her mother since 1997 and has attended primary school,

---

States therefore remains her habitual residence. Borders's argument fails because the Convention directs this Court to examine Jenna's habitual residence "immediately before the removal or retention." Hague Convention, art. 3. Flynn's current petition states that Jenna was wrongfully retained by Borders in August of 2006. Therefore, the Court examines Jenna's habitual residence in 2006, not in 1997. Borders completely ignores the fact that Jenna has spent the last nine years in Ireland living primarily with her mother and making only periodic visits to the United States each summer since 2001.

8

immediately prior to her retention by Borders in the United States.

**II.  Wrongful Retention**

Flynn argues that she was exercising her custody rights over Jenna under Articles 3 and 5 of the Hague Convention at the time Borders wrongfully retained her.  *See* Hague Convention, art. 3 ("The rights of custody . . . may arise in particular by operation of law or by reason of a judicial or administrative decision, or by reason of an agreement having legal effect under the law of that State.").  Flynn submits the High Court Order as evidence that she has joint custody of Jenna and that per this order, Borders only has custody from June 15th to August 15th and his retention of Jenna past August 15th is wrongful.  "Once it is determined that a party had valid custody rights under the country of origin's laws, '[v]ery little is required of the applicant in support of the allegation that custody rights have actually been or would have been exercised.  The applicant need only provide some preliminary evidence that he or she actually exercised custody of the child, for instance, took physical care of the child.'"  *In re Application of Adan*, 437 F.3d 381, 391 (3d Cir. 2006) (quoting Hague Convention Analysis, 51 Fed. Reg. at 10,507); *see McManus v. McManus*, 354 F. Supp. 2d 62, 68 (D. Mass. 2005) ("The undisputed evidence establishes that [the mother] had physical custody of the children in Northern Ireland and was solely responsible for their care (except for financial assistance from [the father]) for

9

approximately eighteen months after [the father] left Northern Ireland and returned to Massachusetts.").

Borders responds that the Georgia Order from 1998 that awarded him sole custody of the children is the order that governs the parties' custody dispute. But as noted by the Convention and several courts, in reviewing this petition, this Court only has jurisdiction to decide the merits of the abduction claim, not the merits of any underlying custody dispute. Hague Convention, art. 19; 42 U.S.C. § 11601(b)(4); *Adan*, 437 F.3d at 391; *Friedrich II*, 78 F.3d at 1063-64. This Court must look to the laws of the country of origin, that is, Ireland, and decide whether Flynn was exercising valid custody rights over Jenna.

Pursuant to the High Court Order, Flynn had valid custody rights under the law of Ireland and would have been exercising such rights but for Borders's retention of Jenna in August of 2006. Borders has not returned Jenna to Ireland pursuant to that order; therefore, Flynn has met her burden of showing wrongful retention and the burden now shifts to Borders.

**III. Defenses to Wrongful Retention**

   **A. Whether Flynn Consented to Jenna Staying in the United States**

Borders argues that in 2001, Flynn consented to Jenna remaining in the United States beginning in 2006 but that this particular arrangement was omitted from the High Court order. The Court has a few misgivings about Borders's argument. First, the

10

only support Borders offers for this consent by Flynn is his own affidavit. In that affidavit, Borders concedes that he received a copy of the High Court Order after it had been entered by the Irish court and that although he noticed the discrepancy and complained to his solicitor, Pauline Corcoran, he took no further action to rectify the mistake. He did not appeal the order. Furthermore, Borders, through a May 3, 2001, letter from his solicitor to Flynn's solicitor, Frances O'Donovan, relied upon the High Court Order to ensure that his children would spend part of the summer of 2001 with him in the United States. (Ex. I to Petitioner's Resp. to Counterclaim.) Flynn also presented several letters from Ms. Corcoran to Ms. O'Donovan apprising her of Borders's efforts to discharge the Georgia Order that grants Borders primary custody.[3]

---

[3] Borders takes issue with the stipulation that discharges the Georgia Order. Flynn and Borders have submitted separate stipulations signed by Borders and a notary and dated June 6, 2001. Flynn's stipulation states that (1) Borders agreed to change the provisions of the Georgia Order that gave him sole custody so that he and Flynn would share joint custody over the children, (2) the High Court Order would replace the Georgia Order, (3) visitation will be as stated in the High Court Order. (Ex. E. to Petition.) Borders's submitted stipulation states that he will agree to change the Georgia Order from sole custody to joint custody when the High Court Order is changed to include the parties' agreement that the children will spend their secondary school years, beginning in 2006, in the United States and their summers in Ireland. (Ex. B to Resp.) In his response to the petition, Borders explains that his draft stipulation was never entered because Flynn never had the High Court Order changed. In his post-hearing brief, Borders claims that "someone changed Respondent's draft and has been attempting to pass it off as an accurate document." (Respondent's Post-Hearing Br. 5.)

Based on Borders's claims, the Court can draw a parallel between this stipulation saga and Borders's dissatisfaction with

None of the letters mention changing either the High Court Order or the Georgia Order to reflect Flynn's consent to allow Borders primary custody in 2006.  Borders has failed to establish by a preponderance of the evidence that Flynn consented to relinquishing primary custody of Jenna in 2006.

### B. Whether Returning Jenna to Ireland Exposes Her to a Grave Risk of Physical or Psychological Harm

Borders argues that there is a grave risk that returning Jenna to Flynn would expose her to physical or psychological harm or otherwise place her in an intolerable situation.  The Article 13(b) "grave risk" exception is "narrowly drawn."  *See Feder*, 63 F.3d at 226.  The Court in *Walsh v. Walsh*, 221 F.3d 204 (1st Cir. 2000) defined "grave risk" as follows:

> The risk must be "grave," and when determining whether a grave risk of harm exists, courts must be attentive to the purposes of the Convention.  For example, the harm must be "something greater than would normally be expected on taking a child away from one parent and passing him to another"; otherwise, the goals of the Convention could be easily circumvented.

*Id.* at 218 (citations omitted).  In general, respondents who

---

the High Court Order:  in both instances, Borders never appealed to the presiding courts to correct the omission of the agreement on where the children would spend their secondary school years.  Borders now brings all of these belated complaints to this Court in support of his defense.  This Court's charge, however, is not to decide whether the Irish court erred in 2001 but to decide whether Borders wrongfully retained Jenna in 2006 and if so, whether any exceptions to wrongful retention apply.  His description of how his 2000 petition was mishandled by the Irish court and his Irish solicitor does not show that Flynn consented to an arrangement not in the High Court Order.

successfully rely on this exception have alleged sustained physical or psychological abuse directed at the child. *See, e.g.*, *Whallon v. Lynn*, 230 F.3d 450, 460 (1st Cir. 2000) (concluding that allegations of physical and verbal abuse did not rise to the level needed to satisfy the Article 13(b) exception and stating that "[t]o conclude otherwise would risk substituting a best interest of the child analysis for the analysis the Convention requires"); *Walsh*, 221 F.3d at 220 (finding that the petitioner's long history of violence and spousal abuse presented a grave risk of harm to his children).

Borders must show by clear and convincing evidence that Jenna faces a grave risk of exposure to physical or psychological harm if returned to Flynn in Ireland. To that end, Borders submitted the affidavit of his son, Jesse Borders. (Ex. C to Resp.) Other than Borders's allegations in his response, this affidavit represents the only evidence to support his argument that returning Jenna to Flynn will place her at risk for abuse. The situations described by Jesse in his affidavit are clearly unsettling: his mother is frequently intoxicated; she may be smoking marijuana; his mother slaps and hits Jenna "from time to time"; his mother asks him to light her cigarettes for her; during an embarrassing incident, his intoxicated mother sat on a vehicle so that her boyfriend would not drive away; during their phone conversations, his mother speaks to him in a degrading tone; his mother has stated to him and Jenna

13

that she wanted to kill his father; and his mother has told him to lie to his father about her employment status in order to receive additional child support.  The affidavit undoubtedly paints a picture of an unhappy home life for any child, but because the Court must determine whether returning Jenna to her mother presents a *grave* risk of harm to Jenna, only the allegations of physical abuse by Flynn towards the young girl give the Court pause.

Faced with similar facts, the *McManus* court addressed the "grave risk" exception.  The mother and father had moved from the United States to Ireland, where the mother is a citizen, with their four children.  *McManus*, 354 F. Supp. 2d at 65.  The marriage deteriorated a few years later and the father moved back to the United States.  While the children were spending a three-week vacation with their father, they told their father that their mother drank alcohol to excess, struck the children, threw objects at them, and that the household was chaotic and the children were unhappy.  *Id.*  Even after the court appointed a guardian ad litem who interviewed the children and found that the children were "frequently exposed to situations that put them at serious risk for current and future psychological harm" and had "presented credible narratives that from a child's mental health perspective would constitute an intolerable situation," the court held that "'serious' risk of harm, short of a 'grave' risk, does not rise to the level of prospective harm that the Article 13(b) exception

14

recognizes as a reason for not returning a wrongfully removed or retained child." *Id.* at 69-70. The *McManus* court noted that courts that have invoked the grave risk exception have focused on "evidence of a sustained pattern of physical abuse." *Id.* at 70.

In *March v. Levine*, 249 F.3d 462 (6th Cir. 2001), the Sixth Circuit affirmed the district court's finding that grandparents who suspected that their son-in-law had killed their daughter, and had obtained a default judgment for wrongful death against him, did not carry their burden of establishing that there was a grave risk of harm to their grandchildren. *Id.* at 472. The grandparents' suspicions later proved true and their son-in-law was convicted in 2006 of murdering his wife and conspiring to murder his in-laws, but at the time he filed his Hague Convention petition, their suspicions did not amount to clear and convincing evidence of grave risk of harm to the children. The Hague Convention establishes a strong presumption in favor of the return of a wrongfully retained child, *Danaipour v. McLarey*, 286 F.3d 1, 13-14 (1st Cir. 2002), and the *March* case is illustrative of the heavy burden that the Convention places on respondents to show grave risk of harm.

Based on the evidence presented — a single allegation by Jesse, and notably, not Jenna — Borders has not shown by clear and convincing evidence that returning Jenna to Flynn exposes her to a

15

grave risk of physical or psychological harm.[4]  Jesse has alleged that his mother has physically abused his sister in the past, and the Court's finding that the affidavit does not present clear and convincing evidence of a grave risk of harm in no way discounts the serious nature of such an allegation.  But rather than stray into the forbidden territory of analyzing which home would provide a better fit for Jenna, this Court follows the weight of authority and concludes that Jesse's allegation that his mother hits and slaps Jenna "from time to time" does not carry Borders's burden under the exception in Article 13(b).  This Court is by no means the exclusive forum, and based on the facts presented by Borders is not the appropriate forum, for Borders to ensure that his daughter is safe while living with her mother.  There is no indication that Irish courts or the Irish authorities are incapable or unwilling to adequately protect Jenna.  *See, e.g.*, Protections for Persons Reporting Child Abuse Act, 1998 (Act No. 49/1998) (Ir.) *available*

---

[4] Borders explains that he was not able to retrieve any documents from the High Court in Ireland to supplement his brief. The Court notes that Borders received a letter from the United States Central Authority on August 25, 2006, explaining that Flynn may take legal action against him to ensure Jenna's return; that Flynn's petition was filed in this Court on September 28, 2006; that a hearing was held on December 1, 2006; and that Borders's post-trial brief was not due until January 5, 2007.  When faced with a petition under the Convention, a court should "act expeditiously in proceedings for return of children."  Hague Convention, art. 11.  In the more than three months since he received notice of the legal proceeding against him, Borders has had adequate time to prepare a defense to the petition and has never moved the Court for the extension of any deadline.

*at* http://www.irishstatutebook.ie/1998_49.html (last visited Jan. 10, 2007); The Commission to Inquire into Child Abuse, http://www.childabusecommission.ie/index.html (last visited Jan. 10, 2007). Based on one allegation from Jesse, the Court will not place conditions on Jenna's return. *See Danaipour*, 286 F.3d at 21 (discussing how conditions or "undertakings," a judicial construct developed by British courts, may be imposed by a court to allow a child to be returned while mitigating the potential risk of exposing her to harm). As Borders has failed to meet his burden, Jenna will be returned to Flynn.

### Conclusion

Accordingly, and for the foregoing reasons, **IT IS ORDERED**:

(1) That Daphne Jude Flynn's petition [Record No. 1] be, and the same hereby is, **GRANTED**;

(2) Therefore, to any peace officer in the Commonwealth of Kentucky or to any federal officer: You are hereby commanded to enforce the instant Order allowing Daphne Jude Flynn to remove Jenna Rae Borders from the United States, and allow Daphne Jude Flynn to accompany Jenna Rae Borders to the Republic of Ireland, giving said Daphne Jude Flynn the right, without interference, to have said child in her lawful custody for the purposes described herein;

(3) That Respondent Michael Borders is to immediately **RETURN** the minor child Jenna Rae Borders to Petitioner Daphne Jude Flynn.

17

Jenna Rae Borders is to be flown to Ireland at the expense of Respondent; and

(4)   That, under ICARA's provisions for the payment of attorney's fees and costs, 42 U.S.C. § 11607(b)(3), Petitioner is to file a motion for attorney's fees by January 17, 2007. Respondent shall have until January 24, 2007, to oppose said motion.

This the 11th day of January, 2007.



Signed By:
*Joseph M. Hood*
United States District Judge